UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| VERTEN DODSON III,<br> Petitioner, | § § § | |
| v. | § § | A-10-CA-099-LY |
| RICK THALER, Director,<br>Texas Department of<br>Criminal Justice–Correctional<br>Institutions Division,<br> Respondent. | § § § § § § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner Verten Dodson III's Petition for Writ of Habeas Corpus, including attached citations and arguments (Document 2),[1] Answer with Brief in Support of Respondent, Rick Thaler, Director of the Texas Department of Criminal Justice, Correctional Institutions Division (Document 27), and Respondent's Original Answer with Brief in Support (Document 11).[2] Dodson, proceeding pro se, has been granted leave to proceed in forma pauperis.

---

[1] Citations to "Attach. at [#]" refer to the arguments attached to Dodson's petition.

[2] This Court previously denied Dodson's habeas petition. *See* Order & Final J. (Aug. 25, 2010) (Documents 15, 16). On appeal, the Fifth Circuit Court of Appeals denied and granted in part a Certificate of Appealability, and vacated and remanded this Court's judgment in part for further proceedings. *See Dodson v. Thaler*, No. 10-50933, 2011 WL 1496963 (5th Cir. Apr. 19, 2011). Following remand, the Director filed a supplemental answer pursuant to order by this Court. *See* Order (May 12, 2011) (Document 24).

*See* Order (Feb. 11, 2010) (granting IFP status) (Document 5). For the reasons set forth below, the undersigned finds that Dodson's application for writ of habeas corpus should be denied.

### STATEMENT OF THE CASE

**I.     PROCEDURAL HISTORY**

According to Respondent, the Director has lawful and valid custody of Dodson pursuant to a judgment and sentence of the 299th Judicial District Court of Travis County, Texas, in Cause No. D-1-DC-07-300805. *Ex parte Dodson*, Application No. 72,525-01, at 17-18.[3] Dodson was charged with murder, to which he entered a plea of not guilty. *Id.* On January 28, 2008, a jury found Dodson guilty as charged and the court assessed punishment at 30 years imprisonment. *Id.* at 4-14, 17-18.

The Third Court of Appeals of Texas rejected Dodson's sole argument on appeal, that the trial evidence was factually insufficient to support the jury's verdict in light of evidence indicating that Dodson acted in self-defense. *Dodson v. State*, No. 03-08-00108-CR, 2008 WL 4823178 (Tex. App.–Austin Nov. 7, 2008, no pet.). Dodson did not file a petition for discretionary review after his conviction was affirmed. *See* Orig. Answer Ex. A.

On July 20, 2009, Dodson filed a state application for writ of habeas corpus challenging his conviction on the basis of factual insufficiency. *Ex parte Dodson*, Appl. No. 72,525-01, at 38, 49. On September 30, 2009, the Texas Court of Criminal Appeals denied the application without written order. *Id.* at cover. Prior to the denial of his state habeas petition, Dodson filed a second application for habeas corpus relief on September 21, 2009, challenging his conviction on the basis of various ineffective-assistance-of-counsel grounds. *Ex parte Dodson*, Appl. No. 72,525-02, at 2-11, 19. The

---

[3] Citations to pleadings and documents in the state-court habeas record appear as *Ex parte Dodson*, Application No. 72,525-01 or 72,525-02, followed by a page number. [#] R.R. at [#] indicates citation to a particular volume of the Reporter's Record in the trial court.

Texas Court of Criminal Appeals denied that application as well, without written order on the findings of trial court without hearing. *Id.* at cover; *see also id.* at 19 (trial court fact findings and recommendation).

Dodson filed a federal habeas petition on January 20, 2010. Pet. at 9. On August 25, 2010, this Court dismissed Dodson's petition with prejudice on the basis that Dodson's claim of factual sufficiency was not cognizable under 28 U.S.C. § 2254 and that his remaining claims were procedurally barred due to his failure to exhaust them. *See* Final J. (Aug. 25, 2010); Order (Aug. 25, 2010) (accepting report and recommendation and denying COA); *Dodson v. Thaler*, No. 10-CA-099-LY, 2010 WL 3211395 (W.D. Tex. Aug. 11, 2010) (report and recommendation).

Dodson subsequently appealed to the Fifth Circuit Court of Appeals, seeking a Certificate of Appealability to appeal this Court's dismissal of his petition. On appeal, the Fifth Circuit denied and granted in part a COA, and vacated and remanded this Court's judgment in part for further proceedings. *See Dodson v. Thaler*, No. 10-50933, 2011 WL 1496963 (5th Cir. Apr. 19, 2011). More specifically, the Fifth Circuit held that Dodson failed to adequately brief his challenge to this Court's determination that a factual-sufficiency-of-the-evidence claim was not cognizable, and he failed to show that reasonable jurists would find it debatable whether this Court's procedural rulings were correct with regard to his claims that he was denied a fair trial, that his trial counsel was ineffective on the subject of toxicology, and his trial counsel was ineffective for failing to move for a mistrial. *Id.* at *1. Accordingly, the court denied a COA with respect to those claims. The Fifth Circuit also decided that Dodson may have indeed exhausted his claim regarding his trial transcript by submitting a motion in state court separate from his habeas petition, but determined that reasonable jurists could not debate whether Dodson made a valid constitutional claim on this point

3

and denied a COA. *Id.* After concluding that reasonable jurists would find it debatable whether this Court correctly decided that Dodson failed to exhaust his claim that his trial counsel was ineffective for failing to investigate a life insurance policy that the victim had allegedly taken out on Dodson's life and to present a life insurance company representative as a defense witness, the court did grant a COA on this claim. *Id.* at *2. The court accordingly vacated this Court's judgment with respect to this single claim and remanded for further proceedings. *Id.*

## II. FACTUAL BACKGROUND

The court of appeals summarized the evidence presented as follows:

Around noon on April 7, 2007, Dodson, his friend Raul Olalde, and Betty Olalde–Raul's mother and Dodson's girlfriend–were driving through a residential neighborhood in north Austin. As they approached the intersection of Hunter's Chase and Colony Creek, Dodson shot Raul Olalde in the back. After the shooting, Betty Olalde stopped the car in the middle of the road. According to eye witnesses in an oncoming car, Raul exited the front passenger seat and walked over to the sidewalk before collapsing on the ground. Betty then stepped out of the driver's seat, screaming and hysterical. A few seconds later, Dodson climbed out of the back seat, walked calmly away from the car, glanced back at Raul, slipped through a gap in the fence, and walked away along a creek bed. A man who came upon the scene shortly thereafter administered CPR to Raul and emergency personnel were called. Raul was taken to a local hospital, where he was pronounced dead on arrival.

The events immediately prior to the shooting are largely disputed. Betty Olalde testified that as they were driving, Raul asked Dodson if there was any crack in the car for Raul to smoke. Dodson indicated that there was a rock of crack in the console between the front seats. According to Betty, Raul then looked for a soda can he could use to smoke the crack and as he lit it and began to smoke, Dodson shot Raul.[1]

> FN1. The crime scene photographs of the car show a soda can on the floorboard and a lighter sitting on the dashboard. Betty testified that she thought the lighter on the dashboard was hers and that Raul had his own lighter. However, the police investigators who searched the car did not find a second lighter nor did they seize crack cocaine or any other drug during the car's inventory.

4

Dodson disputed Betty's version of these events. Dodson testified that, as Raul got in the car shortly before noon on April 7, he was acting "kind of jerky" and seemed angry. According to Dodson, Raul began digging around in the car and then made a sudden move towards his lap, which Dodson interpreted to be reaching for a gun. Dodson knew Raul owned a gun, because Dodson himself had stolen the gun from a vehicle a few days before the shooting. Dodson at first testified that he gave Raul the gun, and then later said that Raul "just snatched it" from him. According to Dodson, Raul always carried his gun in either the pocket of his cargo shorts or in his waistband. Because Raul was not wearing cargo shorts that day, Dodson said he believed Raul's gun was at his waist, and thought Raul was reaching for it in order to shoot Dodson. Dodson admitted that there was a possibility that Raul carried a cell phone at his waist, but maintained that he was certain that Raul was reaching for a gun when Dodson shot him. Dodson claims he then shot Raul in self-defense. After the shooting, police found Raul's gun zippered shut inside a backpack, which, according to Betty, Raul had been holding in his lap. Dodson testified, however, that he was not aware of this fact and sincerely and reasonably believed the gun was at Raul's waist.

Dodson explained his purported belief that Raul was reaching for his gun in order to kill Dodson by pointing to events in the weeks leading up to the shooting. Dodson testified that his relationship with Raul had become strained because Raul was upset about Dodson dating his mother Betty and was frustrated that Betty seemed to choose Dodson over Raul. Raul's wife, Lydia Olalde, also testified to Raul's concern that his mother chose Dodson over him. Dodson testified that Raul claimed to have taken a life insurance policy out on Dodson and to have opened a bank account in Dodson's name. Dodson testified that he thought someone who took out a life insurance policy was "waiting for you to die so they can get some money." Betty and Lydia shared the belief that Raul had taken out a life insurance policy on Dodson, though they each heard this through Dodson, not Raul. Betty testified that Dodson told her about this policy, and Lydia testified that she learned of it from Betty after Raul's death. Dodson also claimed to have been told by Betty that Raul had threatened to kill Dodson about a week before the shooting.

Dodson testified that he was afraid Raul's anger and frustration would lead to violence because Raul had a violent track record with his family and friends. According to Dodson, Raul had tried to rape his younger sister, Vanessa Olalde, and had hit and bruised Betty when she tried to stop him. Dodson claimed that on a different occasion Raul had used his fingers to sexually penetrate Vanessa, that he regularly sent her to beat up women who owed him money for drugs, and that he had once slapped her across the face, causing her to bleed. Dodson also testified that he had seen Raul chase a friend with a knife.

5

Lydia Olalde confirmed the tension between Raul and Dodson. Her characterization of it, however, was significantly different. According to Lydia, Dodson blamed Raul for a prior arrest and conviction for a theft the two men committed together. Dodson believed that Raul had told the police about Dodson's involvement in that theft and suspected Raul of speaking to the police about their more recent car burglaries in an attempt to send Dodson back to jail.[2]

> FN2. The notes taken by the police detective who interviewed Lydia said that Lydia told the detective that Raul suspected Dodson of trying to send Raul to jail, rather than the other way around. Lydia maintained that the police detective had gotten that statement backwards. When first asked about this possibility, the detective testified that she didn't believe she had made a mistake. But on cross examination, after reading the note in the context of the previous sentence, which stated that Dodson had pulled a gun on Raul, the detective changed her mind and testified that she had probably inadvertently switched the names in her notes.

On April 6, 2007, the night before the shooting, the tension between Dodson and Raul appeared to be coming to a head. Dodson testified that he and Raul borrowed Betty's car and drove around together, burglarizing cars and smoking crack–and arguing much of the time. According to Betty, who joined them early the next morning as they drove around north Austin, at one point Dodson accused Raul of being greedy and then threatened Raul with a gun. Betty testified that Raul's reaction to Dodson's threat was to exit the car and walk off by himself. Dodson acknowledged that he and Raul had argued and that Raul had walked away from the car, but testified that he did not recall threatening Raul.

After Raul walked away, he went to the hotel where his wife Lydia and his children were staying. While there, Raul spoke with Lydia about his conflict-filled relationships with Dodson, his mother, and Lydia. According to Lydia, Raul told her that Dodson had pulled a gun on him and accused him of trying to send Dodson back to jail. Lydia testified that Raul was upset that his mother had watched this happen and had done nothing to intervene on Raul's behalf. As they spoke about their own troubled relationship, Raul told Lydia that if he could just shoot himself and her, then all of their troubles would go away. Lydia testified that this statement did not frighten her; she simply took it as evidence that Raul was feeling sad.

While Raul was at the hotel with Lydia and the children, Betty and Dodson drove to Pflugerville to Dodson's sister's house so that Dodson could pick up his social security card and identification card. According to Dodson, he needed those items to look into the bank account that Raul allegedly opened in Dodson's name. As Dodson and Betty were driving back to north Austin,[3] Betty received a call from

Raul, who asked her to bring some clothes to his hotel room. Betty testified that Raul was still angry with Dodson and asked her to not bring Dodson; however, she and Dodson went to the hotel together anyway.

> FN3. Dodson testified that he and Betty were driving to a bank to check on the supposed bank account that Raul had opened. Betty testified that Dodson had wanted to go by the bank to check on the supposed life insurance policy, but that she had refused, and that they were not headed to any specific place when Raul called.

When they arrived at the hotel, Betty went inside to give Raul his clothes. Betty testified that Raul then asked her to give him a ride. When Betty returned to the car, she told Dodson that Raul was coming with them. She asked Dodson if he wanted to continue to drive or if he wanted her to drive. Dodson told her to drive. Raul then came out to the car, carrying his daughter's backpack with his gun inside.[4] Dodson moved to the back seat and told Raul to sit in the front passenger seat.

> FN4. Betty testified at trial that she did not know Raul had his gun with him. This testimony contradicted her testimony before the grand jury. Defense counsel drew this contradiction to the jury's attention. Once Betty finished testifying about this issue before the trial court, she was arrested, outside the presence of the jury, on suspicion of perjury.

They had only driven a few miles when Dodson shot Raul. When police first arrived on the scene and questioned Betty, she told them that she did not know the person who had shot her son. She said they had picked up an unknown hitchhiker who had then shot her son and walked away. She also told the police she was unable to describe the hitchhiker or even tell them his race. After the police found Dodson's identification card on her, Betty admitted that he had been the shooter. Betty testified at trial that she had been protecting Dodson because she loved him and did not want to be alone.

Dodson was arrested on April 9, 2007. The booking officer testified that Dodson told him that "he didn't understand why he was in jail, he did a good thing taking him out. He told me that someone was selling a lot of drugs, kidnapping kids, and he did it and he'll take it." The officer further testified that Dodson said he was "the only one who could get close enough" and that Dodson did not make any statements indicating he was afraid of Raul or had shot Raul in order to protect himself or anyone else.

*Dodson*, 2008 WL 4823178, at *1-3.

### III. DODSON'S CLAIM FOR RELIEF

Dodson contends that he is entitled to habeas relief because his trial counsel was ineffective in failing to investigate a life insurance policy that Dodson claimed that the victim took out on Dodson, and in failing to present a representative from the life insurance company at trial. Pet. at 8 & Attach. at 9, 11.

### IV. EXHAUSTION OF STATE REMEDIES, STATUTE OF LIMITATIONS, AND SUCCESSIVE PETITION BAR

The Director asserts that Dodson procedurally defaulted his claim by failing to exhaust his state-court remedies. Answer at 10-12. The Director does not contend that the claim is barred by limitations, 28 U.S.C. § 2244(d), or the successive petition bar, 28 U.S.C. § 2244(b). *Id.* at 4.

## DISCUSSION AND ANALYSIS

### I. REVIEW UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is defined by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). By its terms, § 2254(d) bars relief on any claim "adjudicated on the merits" in state court, subject only to the exceptions in § 2254(d)(1) and (d)(2). *See, e.g., Harrington v. Richter*, – U.S. –, 131 S. Ct. 770, 780-81 (2011). Federal habeas relief may not be granted for claims subject to § 2254(d) unless the state habeas court's decision "was contrary to" federal law then clearly established by holdings of the Supreme Court, 28 U.S.C. § 2254(d)(1), "involved an unreasonable application of" such law, *id.*, or "was based on an unreasonable determination of the facts" in light of the record before the state court, 28 U.S.C. § 2254(d)(2).

In *Williams v. Taylor*, the Supreme Court explained the "contrary to" and "unreasonable application" provisions of § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). An application of federal law is "unreasonable" only if it is "so clearly incorrect that it would not be debatable among reasonable jurists." *Nobles v. Johnson,* 127 F.3d 409, 418 (5th Cir. 1997) (quotation and citation omitted).

Section 2254(d)(2) likewise commands deference to the state habeas court's factual determinations by precluding relief on any claim that was adjudicated on the merits unless the state-court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(2). Such determinations are presumed to be correct, although a petitioner can rebut this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness not only applies to explicit findings of fact,

9

but also to "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. *See, e.g., Harrington*, 131 S. Ct. at 780-81. Under § 2254(d), a state court need not cite or even be aware of Supreme Court decisions. *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (*per curiam*)). When a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden is met by showing that there was no reasonable basis for the state court to deny relief. *Id.* This is so whether or not the state court indicates which of the elements in a multi-part claim it found insufficient; as the Supreme Court explained, § 2254(d) applies when a "claim," not a component of one, has been adjudicated. *Id.*

With these principles in mind, the Court turns to the issues raised in this case.

## II. DODSON'S CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Dodson contends that his trial counsel was ineffective by failing to investigate a life insurance policy that Dodson believed the victim had taken out on Dodson, and by failing to present a representative from the life insurance company at trial. Pet. at 8 & Attach. at 9-11. Dodson argues that a life insurance company representative would have testified that the victim had a policy on Dodson and that evidence of potential proceeds from Dodson's death would have supported his self-defense theory that the victim was the first aggressor and Dodson was in fear of imminent danger

or death. Pet. Attach. at 11. The Director counters that the claim is conclusory and meritless. Answer at 13.[4]

Having independently reviewed the entire state-court record and Dodson's asserted claim, the Court finds nothing unreasonable or contrary in the state court's application of clearly established federal law or in its determination of facts in light of the evidence, as discussed below.

A.     Review of an Ineffective-Assistance Claim

Ineffective assistance of counsel claims are analyzed under the well-settled requirements set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

---

[4] The Director also argues that Dodson did not exhaust his state-court remedies for the claim that his trial counsel was ineffective for failing to call a representative from the life insurance company as a witness. Answer at 9-12. It not entirely clear if the Director is asserting that Dodson's entire claim was unexhausted or just the claim of ineffectiveness for failing to present a life insurance company representative as a witness. In any event, the Fifth Circuit has treated the two aspects of the ineffectiveness claim based on the life insurance policy as a single claim (failure to investigate and failure to present a witness), *Dodson*, 2011 WL 1496963, at *1, and this Court should follow the direction of that court in vacating and remanding that portion of this Court's earlier judgment. Dodson presented the claim that "counsel failed to investigate thoroughly the life insurance policy taken out on appellant[']s life by the decedent" and invoked the Sixth and Fourteenth Amendments in his second state-court habeas petition. *Ex parte Dodson*, Application No. 72,525-02, at 11. The state habeas court reviewed and decided the claim on the merits. *Id.* at cover (denying petition on findings of trial court); *id.* at 19 (making findings on life-insurance claim). Given the Fifth Circuit's opinion, the Court should conclude that Dodson did exhaust his state-court remedies for this claim and consider the merits of the claim.

11

*Id.* at 687, 104 S. Ct. at 2064.

For the first requirement, the proper measure of attorney performance is "simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2065. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686-89, 104 S. Ct. at 2064-65. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S. Ct. at 2065. Indeed, the Supreme Court has established that counsel should be "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and cautioned against an "'intrusive post-trial inquiry into attorney performance'" and the "'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence.'" *Cullen v. Pinholster*, – U.S. –, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688-90, 104 S. Ct. at 2065-66).

For the second requirement, the question is whether there is a reasonable probability that, absent the alleged error, the result of the proceeding would have been different, a question that must be considered in the context of the entire evidence. *Strickland*, 466 U.S. at 694-95, 104 S. Ct. at 2068-69. A reasonable probability is "'a probability sufficient to undermine confidence in the outcome,'" *Pinholster*, 131 S. Ct at 1403 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068),

which requires a "'substantial,' not just 'conceivable,' likelihood of a different result," *id.* (quoting *Harrington*, 131 S. Ct. at 791).

Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a substantial likelihood that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 1403; *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Because a convicted defendant must satisfy both *Strickland* requirements to demonstrate ineffective assistance, a failure to establish either deficient performance or prejudice makes it unnecessary to consider the other requirement. *Id.* at 697, 104 S. Ct. at 2069; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

In addition to the "highly deferential" view taken of counsel's performance under *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, the Court is also limited in its examination of such claims by the "'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1404 (quoting *Knowles v. Mirzayance*, 556 U.S. –, – n.2, 129 S. Ct. 1411, 1419 n.2 (2009)). In this way, the Court's review of the state habeas court's determination of ineffective assistance claims is "'doubly'" deferential. *Harrington*, 131 S. Ct. at 788 (quoting *Knowles*, 129 S. Ct. at 1420).

As discussed below, Dodson's ineffective-assistance claim fails to satisfy *Strickland*'s and the AEDPA's requirements.

**B.**  **Merits of Dodson's Claim**

Dodson's ineffective-assistance claim fails to satisfy the established prerequisites for such a claim.

1. **No Demonstration of Error**

Dodson fails to demonstrate how any failure by his trial counsel to investigate a possible insurance policy, and based on a potentially discoverable policy, how a failure to present a life insurance company witness constituted professional errors that support ineffective assistance under *Strickland*.

As discussed, *Strickland* commands a strong presumption that counsel's conduct falls within the scope of reasonable professional representation.

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quotation and citations omitted); *see also Pinholster*, 131 S. Ct. at 1404 (stating same).

To render effective assistance, the Sixth Amendment requires counsel to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066. Dodson has not overcome the strong presumption that trial counsel rendered adequate assistance and the challenged conduct was the product of reasoned trial strategy. There is no basis anywhere in the record–except Dodson's assertions in his briefing–to support his claim of professional error, and Dodson does not provide any information regarding the supposed life insurance policy. Absent evidence in the record, a court cannot consider a habeas petitioner's mere allegations to raise a constitutional issue. *See, e.g., Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir.

1983) (citing *Woodard v. Beto*, 447 F.2d 103, 104 (5th Cir. 1971)). Moreover, the subject of the purported life insurance policy was actually addressed at trial. Under his attorney's questioning, Dodson himself testified regarding the existence of a life insurance policy, 7 R.R. at 237, 239-41, as did the wife of the victim, *id.* at 32-34, 64. Neither could substantiate the existence of such a policy, and on cross-examination, the prosecution interjected questions raising real doubts about the existence of a policy, *see, e.g., id.* at 270-75, all of which supports the presumption that there was no professional error.

### 2. No Demonstration of Prejudice

Dodson also fails to satisfy the second *Strickland* requirement, prejudice. *See Strickland*, 466 U.S. at 694-95, 104 S.Ct. at 2068. Although Dodson asserts that his attorney was ineffective in failing to investigate the possible life insurance policy and put on a witness from the hypothetical life insurance company, he fails to explain how such potential evidence would have affected the outcome of his trial.

The state habeas court has already considered and rejected the contention that his trial attorney was ineffective for failing to investigate an insurance policy that the victim had supposedly obtained on Dodson's life. The trial court made the following findings in rejecting Dodson's argument:

> 6. Applicant testified at trial that Raul had taken out [] an insurance policy on applicants's life, and does not allege what other evidence of such a policy counsel might have discovered.

*Ex parte Dodson*, Application No. 72,525-02, at 19.[5]

---

[5] The state trial court recommended that relief be denied and the Texas Court of Criminal Appeals adopted the trial court's findings and denied relief. *Id.* at 19, cover. When there has been

The prosecution presented strong evidence of Dodson's guilt, and even if counsel had investigated the supposed life insurance policy, the outcome of Dodson's trial would still have resulted in a verdict of guilty. At trial, there was no dispute that Dodson shot the victim. Dodson sought to obtain a jury verdict of not guilty by showing that he was justified in using deadly force because he reasonably believed that such force was necessary to protect himself against attempted unlawful deadly force by the victim. *See Dodson*, 2008 WL 4823178, at *4. The prosecution presented testimony by Betty Olalde that when Dodson shot the victim, the victim did not threaten Dodson, the victim was in the process of smoking crack, and Dodson and the victim were not arguing. *Id.* The prosecution presented further evidence that Dodson was angry with the victim, had threatened him in the past, and had accompanied Betty to the hotel to meet the victim, even though Dodson knew the victim did not want him around. *Id.* In addition, the fact that the victim was shot in the back and that impartial, third-party witnesses testified that Dodson exited the vehicle from the rear seat and then walked calmly away from the scene just moments after the shooting provided additional support for the rejection of the self-defense theory. *Id.* Although Dodson's testimony raised the possibility of self-defense, his version of how events transpired in the car was contradicted by Betty Olalde's testimony that the victim was smoking crack at the time of the shooting and did not reach for his lap. *Id.* In addition, Dodson's testimony that the victim had threatened him in the past and was angry with Dodson was countered by the testimony of Betty Olalde and Lydia Olalde

---

one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest on the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594-95 (1991). In this case, the Texas Court of Criminal Appeals adopted the trial court's findings and denied relief on this claim. Because the state trial court issued "the last reasoned opinion" on the matter, this Court "looks through" the Texas Court of Criminal Appeals's order to the trial court's decision. *Id.* at 803, 111 S. Ct. at 2594.

that it was in fact Dodson who was angry with Raul and threatened him. *Id.* at *5. Lastly, the booking officer's testimony that Dodson had volunteered that "he did a good thing taking him out," "he was the only one that could get close enough," and "he did it and he'll take it," together with the conspicuous absence of any statements by Dodson that the victim was reaching for his gun or that he was afraid of the victim, further undermined Dodson's self-serving testimony. 7 R.R. at 85; *Dodson*, 2008 WL 4823178, at *5.[6]

In the context of this evidence, even if there had been an investigation of a life insurance policy or evidence of the purported policy had been presented to the jury, such evidence would not have undermined the overwhelming evidence supporting the rejection of the self-defense theory. Dodson fails to demonstrate a "'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct at 1403 (quoting *Harrington*, 131 S. Ct. at 791).

In addition, with regard to the claim that counsel should have called a life insurance company representative as a witness, Dodson also fails to satisfy the specific requirements for showing prejudice. To demonstrate prejudice based on an omitted witness, a petitioner must show that the witness's testimony would have been favorable and that the witness would have testified at trial. *See, e.g., Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Dodson fails to identify any particular witness, show that the witness would have testified at the trial, or present the testimony that would have been favorable to his defense.

---

[6] In addition, the jury was presented with impeachment evidence against Dodson, specifically, seventeen prior misdemeanor convictions and four prior felonies, as well admissions of being a regular user of crack cocaine, burglarizing cars, selling crack, smoking crack in the hours just before the shooting, and having impaired judgment when high. *Dodson*, 2008 WL 4823178, at *5 n.6.

Without a demonstration of either error or prejudice, Dodson fails to show that the state court's decision was an unreasonable application of the clearly established federal law of *Strickland*, or was contrary to that established law. Accordingly, 28 U.S.C. § 2254(d), as amended by the AEDPA, bars habeas relief.

## RECOMMENDATION

It is recommended that Dodson's application for writ of habeas corpus be denied.

## CERTIFICATE OF APPEALABILTY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). In cases in which a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim

of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Dodson's Section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003) (citing *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The district court need not consider frivolous, conclusive, or general objections. *Battles v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall also bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is

ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 28th day of June, 2011.

_____
ROBERT PITMAN
UNITED STATES MAGISTRATE JUDGE